JANUARY TERM, 1852.  19

The State ex rel. Savary v. Caroline, a Slave, et als.

## THE STATE EX REL. SAVARY vs. CAROLINE, A SLAVE, ET ALS.

1. Exclusive power over the importation of slaves is vested in Congress after the first day of January, 1808, by the ninth section of the first article of the Constitution of the United States.
2. The State courts could at no time exercise any jurisdiction in cases of violation of the laws prohibiting the slave trade, except such as were authorized by the Congress of the United States ; and all jurisdiction is now taken away from them, by the fourth section of the act of Congress, approved March 3, 1819.
3. When a court has no jurisdiction over the subject matter of a suit, neither the express nor the implied consent of the parties will confer it.

ERROR to the Circuit Court of Talladega.
Tried before the Hon. E. Pickens.

LIBEL to forfeit slaves brought into Alabama from the Republic of Texas.

The relator alleges that the slaves named and particularly described in the libel were brought into this State from the Republic of Texas, contrary to the act of Congress for the suppression of the slave trade, and prays that they may be declared forfeited, and sold for the benefit of the State and himself.

George S. Ragland and Reese Howell, in whose possession the slaves were, and who claimed absolute property in them at the time the libel was exhibited, came in as respondents, and assigned reasons against the decree of forfeiture and sale prayed for. There were demurrers and replication in the pleadings in the court below, which it is not necessary to state particularly. The Circuit Court dismissed the libel; and its action on the relator's demurrer, and in decreeing a dismissal, and adjudging costs against the relator, are here assigned for error.

L. E. PARSONS, for plaintiff in error.

RICE & MORGAN, contra:

LIGON, J.—The first question to be disposed of in this

case is, had the Circuit Court jurisdiction of the subject matter of the controversy, and power to hear and determine the case presented in the libel of the relator? Should it appear that this jurisdiction is wanting, an examination of the errors assigned will become useless and unnecessary.

The State courts are dependent, for all their jurisdiction on the subjects involved in this controversy, upon the legislative action of the Congress of the United States, and upon that of the several States for the form of proceeding to call into action and carry out the jurisdiction thus conferred by Congress.

By the ninth section of the first article of the Constitution of the United States, it is provided, that "The migration or importation of such persons as any of the States now existing shall think proper to admit, shall not be prohibited by the Congress prior to the year one thousand eight hundred and eight, but a tax or duty may be imposed on such importation, not exceeding ten dollars for each person." Under this provision of the Constitution, power over the slave trade, then carried on extensively and profitably by the most commercial States of the Confederacy, was conferred on Congress, but not to be exercised for prohibitory purposes prior to the year 1808.

On the 2d of March, 1807, the Congress of the United States passed an act, entitled, "An act to prohibit the importation of slaves into any port or place within the jurisdiction of the United States, from and after the first day of January, 1808." The first section of this act provides, "That from and after the 1st day of January, 1808, it shall not be lawful to import or bring into the United States or the territories thereof, from any foreign kingdom, place, or country, any negro, mulatto, or person of color, with intent to hold, sell, or dispose of such negro, mulatto, or person of color, as a slave, or to be held to service or labor."—U. S. Stat. at large, vol. 2, 426. The second section of this act declares, that the vessel in which such persons are brought shall be forfeited. The fourth section, after providing certain penalties and forfeitures against the importation of "slaves, mulattoes, and persons of color," for the purposes prohibited in the first section, proceeds: "And neither the importer, nor any person or per-

sons claiming from or under him, shall hold any right or title whatsoever, to any negro, mulatto, or person of color, nor to the service or labor thereof, who may be imported or brought within the United States, or territories thereof, in violation of this law; but the same shall remain subject to any regula. tions not contravening the provisions of this act, which the legislatures of the several States or Territories at any time hereafter may make, for the disposing of any such negro, mulatto, or person of color."

Here, power is given to the legislatures of the States and Territories to confer jurisdiction on such courts within their respective limits, as they may designate, and to prescribe the manner in which this jurisdiction shall be called into action and exercised, as well as to provide what disposition should be made of the "negro, mulatto, or person of color," thus brought within their respective limits, contrary to law;— wisely and prudently respecting the local institutions of the several States and Territories, and leaving it to them to as. sign to the class of persons thus unlawfully thrown upon them, the social station most consistent with those institutions.

Under the authority of this provision of the act of March 2d, 1807, the legislature of the Mississippi Territory, then exercising lawful jurisdiction over the territory which now forms the State of Alabama, passed an act in the year 1815 declaring, that, "Any slave or slaves, brought or imported into this Territory, contrary to the laws of the United States, in such case made and provided, shall be condemned by any superior court of this Territory, within whose jurisdiction the said slave or slaves shall be brought or be seized, upon libel filed in the said court; and shall be sold by the proper officer of the court to the highest bidder, at public auction, for ready money, after advertising the time and place of such sale, in some newspaper in the Territory, at least fifteen days previous thereto."—Clay's Dig. 547, § 1. This statute remained unaltered, and was in force in the "Alabama Territory," at, and after its separate organization in 1817, and was adopted by the legislature of the State, after its admission into the Union in the year 1819; and so the law remained until the year 1823, when the manner of proceeding to condemn and

sell such slaves was materially altered, and a general agent was required to be appointed by the Governor, to prosecute the libel in such cases, and dispose of the slaves, when condemned.—Clay's Dig. 547–'48, §§ 3, 4, 5, 6, 7, 8, 9, 10. It is not necessary, in this case, for us to determine how far and to what extent the act of 1823 would affect the proceedings in the court below, which were evidently intended to be conformed to the act of 1815, as we are fully persuaded the legislation of Congress on the subject has put an end to the jurisdiction of the State courts in all such cases.

By the fourth section of an act of Congress, approved 3d March, 1819, entitled "An act in addition to the acts prohibiting the slave trade," it is enacted "that when any citizen or other person shall lodge information with the attorney for the district of any State or Territory, as the case may be, that any negro, mulatto, or person of color has been imported therein contrary to the provisions of the acts in such case made and provided, it shall be the duty of said attorney forthwith to commence a prosecution by information; and process shall issue against the person charged with holding such negro, negroes, mulatto, mulattoes, person or persons of color, so alleged to be imported contrary to the provisions of the acts aforesaid; and if, upon the return of the process executed, it shall be ascertained by the verdict of the jury that such negro, negroes, mulatto, mulattoes, person or persons of color, have been brought in, contrary to the true intent and meaning of the acts in such cases made and provided, then the court shall direct the marshal of said district to take the said negroes, mulattoes and persons of color into his custody for safe keeping, subject to the orders of the President of the United States; and the informer or informers, who shall have lodged the information, shall be entitled to receive, over and above the portion of the penalties accruing to him or them by the provisions of the acts in such cases made and provided, a bounty of fifty dollars for each and every negro, mulatto, or person of color, who shall have been delivered into the custody of the marshal; and the Secretary of the Treasury is hereby authorized and required to pay, or cause to be paid, the aforesaid bounty, upon the certificate of the clerk of the court for the district where the prosecution may be had, with the

seal of the office thereto annexed, stating the number of negroes, mulattoes or persons of color so delivered."

The sixth section repeals all acts and parts of acts "repugnant to the provisions of this act."

The provisions of this act are, in our opinion, utterly inconsistent and repugnant to those provisions in the acts of 2d of March, 1807, and 20th of April, 1818, which are substantially the same, so far as they confer power on the States and Territories to bestow jurisdiction on their own courts to proceed by libel or information for the condemnation and sale of negroes, mulattoes and persons of color imported, or brought into them contrary to the acts of Congress, and being repugnant, the former, to the extent of such repugnance, are repealed.

According to the act of 1819, all power over the subject is conferred on the District Courts of the United States, their attorneys and marshals; and the power of disposing of the persons unlawfully imported is taken from the States, and conferred on the President of the United States. Nothing is left to the former but their useless statutes, passed to carry out the act of 1807.

Congress having, by this means, revoked the authority given to the States and their courts, the jurisdiction of these courts falls also.

But it may be said that as no exception was taken by the respondents in the court below to its jurisdiction, it cannot be urged in the Appellate Court; and that by responding in that court, and pleading, they have consented to the jurisdiction. To this it is replied, that when a court has no jurisdiction over the subject matter of a suit, neither the express nor implied consent of the parties will confer it. In Wyatt v. Judge et al., 7 Por. 37, it is said, and we think rightly, "that an objection to the want of jurisdiction was allowable in the Appellate Court, though not made in the court below." Suppose we were to reverse the judgment on the assignment of errors in the record, we could not remand the cause to a court that could render no judgment upon the matters in controversy.

The judgment of the Circuit Court is affirmed.